**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 4019 |
| | ) | |
| BETTY LOREN-MALTESE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

The court has under consideration the petition of the defendant Betty Loren-Maltese to vacate her conviction and sentence pursuant to 18 U.S.C. § 2255. She claims three violations of her Sixth Amendment right to effective representation by trial counsel.

**THE APPLICABLE LAW**

The parties agree on the Sixth Amendment law, which is well established. The basic rules are set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984):

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in

    any given case.  Even the best criminal defense attorneys
    would not defend a particular client in the same way.

Id. at 689 (citation omitted).  In addition to proving a failure of

performance by counsel under this test, a defendant making a Sixth

Amendment claim must also prove prejudice resulting from counsel's

deficient performance.  The Strickland Court explained the required

showing of prejudice in the following  terms:

    The defendant must show that there is a reasonable
    probability that, but for counsel's unprofessional
    errors, the result of the proceeding would have been
    different.  A reasonable probability is a probability
    sufficient to undermine confidence in the outcome.

                    *    *    *    *

    The governing legal standard plays a critical role in
    defining the question to be asked in assessing the
    prejudice from counsel's errors.  When a defendant
    challenges a conviction, the question is whether there is
    a reasonable probability that, absent the errors, the
    factfinder would have had a reasonable doubt respecting
    guilt.

                    *    *    *    *

    In making this determination, a court hearing an
    ineffectiveness claim must consider the totality of the
    evidence before the judge or jury.  Some of the factual
    findings will have been unaffected by the errors, and
    factual findings that were affected will have been
    affected in different ways.  Some errors will have had a
    pervasive effect on the inferences to be drawn from the
    evidence, altering the entire evidentiary picture, and
    some will have had an isolated, trivial effect.
    Moreover, a verdict or conclusion only weakly supported
    by the record is more likely to have been affected by
    errors than one with overwhelming record support.  Taking
    the unaffected findings as a given, and taking due
    account of the effect of the errors on the remaining
    findings, a court making the prejudice inquiry must ask
    if the defendant has met the burden of showing that the

decision reached would reasonably likely have been different absent the errors.

Id. at 694-96.

## **DISCUSSION OF THE DEFENDANT'S SIXTH AMENDMENT CLAIMS**

We will now discuss each of the defendant's three claims in terms of the Strickland requirements of deficient performance and prejudice.

### I. **Failure to Call Witnesses Concerning the October 1996 Board Meeting**

At the trial, the government offered a series of Cicero Town Board minutes of meetings that occurred from 1989 through February 1997. The purpose was to show that from 1989 through April 1993, the Board voted monthly on insurance payments, but after April of 1993, when the defendant Loren-Maltese became Town President, the Board did not vote again on monthly insurance payments until January 14, 1997. This, in the government's view, tended to show that the making of the insurance payments was controlled by Loren-Maltese rather than by the Board. The defendant Joseph DeChicio objected to the amendments contained in the January 6, January 14, and February 11, 1997 minutes because they purported to establish that he had been instructed at the October 19, 1996 meeting not to make any further insurance payments to Specialty Risk Consultants ("SRC") without specific Board approval. DeChicio argued that he had been given no such direction and that the statements to the contrary contained in the amendments were untrue. He contended

that the admission of these amendments as business records would deny him the right of confrontation. We agreed with DeChicio and refused the government's offer of the amendments.

Loren-Maltese later offered the same exhibits, which we refused again on the same basis. We made it clear to defense counsel, however, that the amendments might be admissible if authenticated by witnesses who could testify to their accuracy. No such witnesses were called by the defendant, who argued on appeal that our refusal of the amendments as business records was error. In affirming the defendant's conviction, the Court of Appeals held that the amendments did not qualify as business records because the circumstances attending their preparation raised a strong inference of "doctoring." United States v. Spano, 421 F.3d 599, 604 (7th Cir. 2005).

In her § 2255 petition, Loren-Maltese argues that her trial counsel, Terence P. Gillespie and Marc W. Martin, were negligent in not calling Town Board members as witnesses to testify that the January and February 1997 amendments were accurate. (Actually, the question is whether those amendments were accurate in reciting that DeChicio had been directed at the October 1996 meeting to stop insurance payments to SRC and that he later reported that he had done so. The essential witness, therefore, would have been someone present at the October 1996 meeting who could supply that testimony. The 1997 amendments to the minutes would be relevant

only to the extent that they confirmed that testimony by someone who had been present at the October 1996 meeting).

In support of her petition, the defendant has submitted the affidavits of Town Clerk Marylin Colpo and Town Trustees Moses Zayas, Richard Smetana and Michael A. Frederick.

The most significant thing about these affidavits is that all of the affiants state that they recall talking with defendant's attorneys at the time of the trial but have little recollection of what was discussed. <u>None</u> of the affiants state that they told the attorneys anything about DeChicio having been instructed by the defendant or anyone else at the October 1996 meeting not to make insurance payments or about having heard DeChicio later say that he had not made the payments.

Marylin Colpo's affidavit refers to discussions at the January 1997 board meetings that relate to the issue of whether DeChicio had been told not to make the insurance payments, but these references are to the meetings at which the <u>amendments</u> in question were considered. Colpo's affidavit does not say anything about the October 1996 minutes, which contained no reference to any such direction being given to DeChicio.

As illustrated by the Colpo affidavit, defendant tends to conflate the question of what was said at the 1997 meetings about what had been said at the October 1996 meeting with the entirely separate question of what <u>was</u> said at the October 1996 meeting.

While defendant's affiants recall discussions at the 1997 meetings that address the 1996 meeting, what they do <u>not</u> claim to recall is what was said at the 1996 meeting.

The affidavit of Trustee Moses Zayas states that the January 14 and February 11, 1997 minutes, containing the amendments in question, "are consistent with [his] recollection of discussions which occurred at Board meetings around this time period," but he does not say that he has any recollection of DeChicio having been given any instructions at the October 1996 meeting or at any time prior to the 1997 meetings at which amendments to the October 1996 meeting were discussed.

Trustee Richard Smetana's affidavit states that he recalls a Board meeting in the fall of 1996 at which "Betty told Joe DeChicio not to make any more payments to Specialty Risk ..." and a subsequent meeting at which Betty asked DeChicio if he had made any payments and he said no, he had not. As noted above, Smetana acknowledges that he conferred with the defendant's attorney on one occasion, but he does not say that he told the attorney about any of these discussions at the Board meetings. He does not say what he told the lawyer.

Trustee Michael A. Frederick joined the Board on November 26, 1996, so apparently he was not in attendance at the October 1996 meeting. He states that "on at least two occasions, Betty directed Joe DeChicio not to wire any more payments to Specialty Risk

Consultants," and that he has reviewed the minutes of the January 14 and February 11, 1997 meetings and does not recall the discussions about amending the minutes of the preceding Board meetings. He acknowledges that he talked to the defendant's attorney and to an investigator around the time of the trial but does not say that he told the lawyer or the investigator that he had heard the defendant or anyone else tell DeChicio not to make payments to Specialty Risk Consultants.

In her petition, the defendant argues that defense counsel were constitutionally inadequate in failing to call these affiants as witnesses to authenticate the January and February 1997 minutes:

> The Town could and did pay SRC without its president's knowledge. The minutes establish that petitioner ordered Town Treasurer DeChicio to cease payments to SRC in October 1996, when the fraud was exposed, but DeChicio disobeyed this order and sent another $1.2 million of Town funds to the crooked company.
>
> *   *   *   *
>
> There was no reasonable strategic reason for trial counsel to *not call* available witnesses to authenticate the minutes and to rebut the false allegations that his client had fraudulently altered the minutes.
>
> *   *   *   *
>
> The excluded minutes were critical to petitioner's defense and would have likely led to her acquittal ... Yet, inexplicably, counsel failed to call witnesses to authenticate the minutes and to rebut the false allegations that they were "doctored."

(Mem. in Supp. of Pet. at 21-22.)

As the government points out, the jury heard nothing about any "doctoring" of the minutes, nor anything else about the minutes in question, because they were excluded from evidence.[1]  Defendant is correct, however, in her assertion that if DeChicio had been instructed not to make insurance payments, it would have been important for the jury to know that.  (Whether it would have resulted in an acquittal is another matter, which we will discuss infra.)  The defendant cites several cases in which the failure of counsel to interview potentially exculpatory witnesses was deemed a Sixth Amendment violation.  (Id. at 22-23.)  These cases are distinguishable, however, because defense counsel in this case did interview the witnesses defendant says should have been called to testify.  We have already noted that each of these potential witnesses has acknowledged in an affidavit that he or she was interviewed by defendant's attorneys and that none of them claims to have told the attorneys that they had any knowledge of DeChicio being instructed not to pay insurance claims or that he later denied having paid claims.

The reason these affidavits are silent as to what the affiants told the attorneys is apparent from the affidavits the government has obtained from the attorneys:  each of defendant's affiants told

---

[1]The defendant makes the further point that at sentencing the court took into consideration the fact that the defendant controlled the Board to the extent that she could direct the preparation of amendments to the minutes that would contain false statements about what had occurred at previous meetings.  This is true, but, for reasons that will be apparent by the conclusion of this opinion, we do not regard it has a basis for § 2255 relief.

the attorneys that they had no recollection of DeChicio being told at the October 1996 meeting that he was to stop making insurance payments to SRC.   Both of defendants' trial attorneys filed original and supplemental affidavits.[2]   Mr. Gillespie and Mr. Martin stated in their affidavits that they attempted to interview Mark Moro, who had been the Town Clerk at the time of the October 1996 meeting.   He refused to talk to either the defense or the government and indicated that, if called to testify, he would invoke the Fifth Amendment.   Mr. Gillespie's original affidavit states that aside from Mr. Moro, he and Mr. Martin

> interviewed every other individual who was present at the
> board meeting of October, 1996.  This included Ms. Coppo
> [sic] who was the deputy clerk and whose notes of that
> meeting did not reflect Ms. Maltese's directive to
> DiChicio [sic].   We also interviewed Dennis Both, the
> town attorney, and every board member who was present.
> The focus of our inquiries were [sic] of course whether
> or not any of the parties present at the October, 1996
> board meeting could recall Ms. Maltese's directive to
> DeChicio.

(Gillespie Aff. at 2.)   Two things about Mr. Gillespie's affidavit are especially significant.   He states that Ms. Colpo, the deputy clerk, kept notes of the October 1996 meeting that were separate from the minutes.   Not only do the minutes of the meeting contain no reference to any directive to DeChicio, but Ms. Colpo's separate notes contain no reference to such a directive.

---

[2]   The affidavits were filed pursuant to defendant's waiver of any attorney-client privilege concerning the subject matter.   The supplemental affidavits were requested by the court because the originals lacked sufficient detail.

More importantly, in his supplemental affidavit, Mr. Gillespie states that "[t]he parties who were interviewed told us they did not recall Ms. Maltese directing Mr. DeChicio to stop payments to SRC at the October 1996 meeting." The affidavits of Mr. Martin, Mr. Gillespie's co-counsel, are to the same effect. In his original affidavit, Mr. Martin confirms the substance of Mr. Gillespie's original affidavit, and, in his supplemental affidavit, Mr. Martin states that "[t]o the best of my recollection, no person interviewed recalled Betty Loren-Maltese directing Mr. DeChicio to stop payments to SRC at the October, 1996 meeting."

In her Response to Trial Counsel's Supplemental Affidavits, defendant argues that the inability of the persons interviewed to remember the alleged directive to DeChicio was due to the fact that Messrs. Gillespie and Martin did not ask them to refresh their recollections by reviewing any Board minutes. Defendant furnishes the supplemental affidavit of trustee Richard Smetana stating that he was not asked at his meeting with defense counsel to review any Board minutes. In describing the meeting with counsel, he states:

> This meeting took place in a conference room on the first floor of Cicero Town Hall. I believe the meeting lasted about a half hour. I can't remember precisely what Mr. Gillespie asked at this meeting. To the best of my recollection, the focus of his questions was on specific dates of specific board meetings and no one was able to remember those dates.

In his original affidavit, Mr. Gillespie states that "the focus of our inquiries [was] of course whether or not any of the parties

present at the October, 1996 board meeting could recall Ms. Maltese's directive to DeChicio." If Mr. Smetana is correct in his recollection that the meeting "lasted about a half hour," it must have been thorough. It would not take a half hour to elicit negative responses to the question of whether anyone remembered DeChicio being given a directive at the October 1996 meeting.

Obviously, the minutes of the October 1996 meeting would not refresh anyone's recollection that a directive was given, since those minutes contain no reference to such a directive. As far as the 1997 minutes containing the purported amendments to the October 1996 minutes are concerned, we do not see how they would refresh the "recollection" of anyone present at the 1996 meeting. For the defendant's argument to have any force, we would need to know more about what minutes she has in mind and what they contain that would, for instance, refresh Ms. Colpo's recollection of a directive that was referred to neither in the October 1996 minutes themselves nor in her personal notes of that meeting.

It seems clear enough that there would have been no point in calling any of the persons present at the October 1996 meeting – Colpo, Zayas, Smetana or Frederick – because none of them had any recollection of DeChicio's having been instructed not to make any further insurance payments to SRC at the October 1996 meeting. They would not have been able to testify that such a directive was given at the meeting, or that the purported "amendments" to the

minutes of that meeting contained in the 1997 minutes accurately depicted what had occurred at the October 1996 meeting. In fact, had counsel called these witnesses, their testimony would have undermined defendant's appellate argument that the 1997 amendments accurately reflected what had occurred at the October 1996 meeting and therefore should have been admitted as business records. Ms. Colpo and the three Trustees could have done nothing but highlight the fact that there was no relevant evidence to support the amendments. The only possible strategy was to argue on appeal that it had been an error to exclude the amendments. Mr. Gillespie explained that in the following portion of his original affidavit:

> After interviewing everyone, (except for Mr. Morrow)[sic], who was present at the meeting, we made at [sic] the decision not to call witnesses. It was our opinion that not doing so best preserved the issue should an appeal be necessary. In fact, during the case, we re-offered the minutes and made a detailed offer of proof arguing that the minutes should be admitted as self authenticating public records.

(Gillespie Aff. at 2-3.) Mr. Martin's original affidavit says the same thing:

> After our interviews, Mr. Gillespie and myself made what we viewed as a strategic decision not to call the Trustees as witnesses.

(Martin Aff. at ¶ 5.) Considering the predicament they were in, we think it is clear that Messrs. Gillespie and Martin took the only option they had: avoid the witnesses and preserve the business-records argument for appeal. The fact that the argument was

rejected on appeal does not indicate that counsel had any better choice.

This brings us to the question of prejudice. There was none. The defendant was not prejudiced by the failure of her attorneys to call witnesses who had no knowledge of facts that would support her defense that she had instructed DeChicio not to make insurance payments to SRC and that he had misled her into believing that he had stopped the payments. Whatever evidence defendant might have had to support that defense could not have been supplied by her four affiants, and the petition suggests no other evidence of which defense counsel were made aware.

Our own conclusion is that there could have been no credible evidence to support this defense because in fact no such directive was ever given to DeChicio in October 1996 or at any other relevant time. This is why no witness offered to testify that such a directive was given. It is why the January and February 1997 amendments were the only "evidence" of the directives and why it was so important to the defense that they be admitted.

But even assuming that some witness had been willing to testify to a recollection that the directive had in fact been given to DeChicio in October 1996, we cannot say that there is a reasonable probability that such testimony would have led to a different result. The evidence was overwhelming that Loren-Maltese knew the insurance payments to SRC were continuing, <u>whatever</u>

DeChicio might have been told, and that the amounts were so large that the Town was on the verge of bankruptcy. Defendant acknowledges that the "Town's insurance budget repeatedly was exceeded and the Town was running a deficit." (Mem. in Supp. of Pet. at 4.) This was called to her attention on numerous occasions. The weight of the credible evidence was that she was intimately familiar with all important matters affecting the Town and kept tight control over its affairs.

We conclude that the decision of Messrs. Gillespie and Martin not to call the defendant's present affiants as witnesses was not only well "within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, but it was the only reasonable choice they had. This finding does not require us to rely on any presumption to that effect, although Strickland does require that a "strong presumption" be indulged, see id. The conclusion flows from an analysis of what actually occurred, as opposed to what the petition encourages us to believe occurred.[3] When, in addition to the analysis, we indulge a strong presumption of reasonableness, any possible doubt that the representation was constitutionally adequate simply evaporates.

---

[3]We suggest to defendant's present counsel that it might have been appropriate to include in the defense affidavits, or at least somewhere in the petition, the fact that the affiants had no recollection of a directive being given to DeChicio at the October 1996 board meeting. Had that been conceded at the outset, it might not have been necessary for the government to respond to this part of the petition.

On the question of prejudice, there clearly is no reasonable probability that, had defendant's affiants been called as witnesses, the defendant would not have been convicted.

**II.** **Failure to Call Carol Guido as a Defense Witness**

One of the contentions of the government at the trial was that Ms. Loren-Maltese and her co-defendant Town officials received prompt and preferential payment on their medical insurance claims, as contrasted to other Town employees, who were delayed for long periods of time. It was the SRC co-defendants who saw to it that the Town officials' claims were promptly paid, and this, in the government's view, was part of the consideration the Town defendants received in return for their participation in the conspiracy.

The defendant did not testify at the trial, but her defense counsel argued that she was unaware of the serious backlog in the payment of employee claims. One of the government's witnesses was Cynthia Camp, who had worked as a group health benefits claims supervisor for Specialty Claims Management ("SCM"), the arm of Specialty Risk Consultants that handled the Town's insurance claims. Ms. Camp was directly involved with the processing of the claims. She testified at great length about the large backlog of unpaid claims that built up over the life of the conspiracy and the numerous complaints received from Town employees and medical providers concerning the unpaid claims. One of the Town employees

she testified about was Carol Guido, a cancer patient whose long-overdue chemotherapy bills were not paid because SRC had not provided SCM with the necessary funding. Ms. Camp testified that, at the same time, funding was provided to promptly pay a medical bill for Ms. Loren-Maltese.

Carol Guido was not called as a witness at the trial. In support of her petition, the defendant has filed an affidavit of Ms. Guido describing how in early 1995 she received a notice from the hospital threatening to put a lien on her house because of her unpaid bills. The affidavit states that Ms. Guido's husband called Ms. Loren-Maltese to find out why the bills were not being paid. The defendant told him not to worry and that the bills would be taken care of promptly. Within three weeks of the telephone call, Ms. Guido's bills were paid.

The defendant argues that her trial counsel were ineffective in failing to call Ms. Guido as a defense witness: "Guido's affidavit reveals that petitioner was not indifferent to the plight of Ms. Guido, or to the plight of any person covered by the Town's insurance. To the contrary, when the situation was brought to her attention, petitioner personally intervened and Ms. Guido's bills were paid." (Mem. in Supp. of Pet. at 17-18.)

What is missing in this argument is any indication that either Mr. Gillespie or Mr. Martin was told by the defendant or anyone else about this assistance the defendant rendered to Ms. Guido. No

affidavit or any other kind of representation has been made to show that either attorney was on notice that Ms. Guido might have had anything favorable to say about the defendant.

Moreover, it would have been questionable strategy to call Ms. Guido even if defendant's attorneys had known of her possible testimony. Ms. Camp's testimony established that the large backlog of unpaid claims was a chronic problem. Ms. Guido was just one of many. Ms. Camp testified that as of May 4, 1994, the backlog of unpaid claims was $416,091.61. (Tr. at 2438.) "We would just try to keep up with it as best we could. We did start getting phone calls and people being very upset with us. So we had to field those phone calls." (Tr. at 2441.) By September 2, 1994, the backlog was $628,356.39. At that point the claims were "beginning to become six to nine months old." (Tr. at 2453-54.) It had become a "recurrent problem." (Tr. at 2454.) "[W]e were starting to get more and more phone calls from people that wanted their claims paid. They were very upset, irate, and some days we would take phone calls like that all day long." On some days the complaints were so numerous that they could not process claims. (Tr. at 2454-55.) By November 11, 1994, the backlog was $936,011.06. (Tr. at 2461.) By the middle of 1995, the backlog had reached almost one million dollars. (Tr. at 2727.)

It is unrealistic to suggest that, in the face of this testimony, the defendant could have created a reasonable doubt as

to her consciousness of the fact that claims were not being paid
and that there was wide-spread dissatisfaction among the Town
employees concerning the neglect of their claims by presenting the
testimony of Carol Guido that the defendant responded promptly to
one unpaid claim that was called to her attention.  More likely,
Guido's testimony would have raised the question as to why the
defendant did not act in similar fashion as to the enormous backlog
of <u>other</u> unpaid claims that she must have known about.  Mr. Guido
was a squeaking wheel, not employed by the Town, and the defendant
obviously had it within her power to contact SRC and demand that
his wife's hospital bill be paid.  There must have been a reason
she did not do the same thing for the other unpaid claims, and the
jury would likely have concluded that it was because she knew the
money was being used by her co-defendants for other purposes.  In
short, presenting Guido's testimony would simply have emphasized
the defendant's inaction regarding the mass of unpaid claims.  It
would have been good strategy – and certainly not poor strategy –
for counsel not to call Carol Guido as a witness even if their
attention had been drawn to her possible testimony.

Mr. Gillespie's original affidavit describes the strategic
reason he would not have called Ms. Guido even had he known about
her:

> It was our theory of defense that Ms. Maltese was not
> actively involved in overseeing insurance problems.  That
> except for certain extra benefits that were historically
> provided to elected Cicero officials she was similarly

> situated as other town employees. Indeed, I recall
> arguing at closing arguments that Ms. Maltese herself had
> problems getting her bills paid. It was my belief that
> evidence of Ms. Maltese [sic] active and successful
> intercession with specialty risk officials on behalf of
> individual employees encountering problems with their
> insurance would not further our theory of defense. That
> being said, I have no present recollection of Ms. Guido.
> I do not believe I have ever talked to her or considered
> calling her as a witness.

(Gillespie Aff. at 3.) Certainly it cannot be said that Mr. Gillespie's explanation is indicative of deficient performance. His decision to emphasize the defendant's non-involvement, rather than her involvement with claims problems, had a better chance of success than any effort to convince the jury that she was interested in a broad-scale solution to the backlog problem.[4]

The defendant has made no showing that defense counsel should have called Carol Guido as a witness or that, had they done so, the result of the trial would have any different.

### III.  Failure to Call Dennis Both as a Defense Witness

Dennis Both was the Cicero town attorney from 1985 to 1997, which included the entire period of the insurance fraud. He was called as a government witness, under a grant of immunity, to testify about certain historical matters concerning the Town of Cicero, but he was not called as a defense witness. The defendant has submitted an affidavit from Mr. Both in support of her petition. The affidavit recites that, at the request of the

---

[4]It should be remembered that the backlog was due to the fact that the SRC defendants were using the Town's money for their personal purposes, such as the purchase of a horse farm and a golf club, rather than to pay claims.

defendant, he drafted a letter to Frank Taylor, President of Speciality Risk Consultants, expressing concerns about the firm's handling of the Town's health insurance claims and threatening to fire the firm if its performance did not improve. The defendant reviewed and signed the letter, and it was sent to Mr. Taylor. A copy of the letter, dated September 8, 1994, is included as Exhibit A to Mr. Both's affidavit.

Both sides referred to the letter during the trial, but it was not offered into evidence. The defendant argues that this was negligence on the part of Mr. Gillespie and that there is a reasonable probability that it altered the outcome of the trial and the length of defendant's sentence. (Mem. in Supp. Pet. at 27.)

We do not know why the letter was not offered into evidence, and Mr. Gillespie's affidavit offers no explanation. He states that he stressed to the jury in his final argument that the letter was anti-conspiratorial. (Gillespie Aff. at 3.)

The defendant argues in her reply brief that the date of the letter was the important thing. The fact that it was sent on September 8, 1994 would have rebutted the government's statement in final argument that it was sent in 1993, when the defendant was attempting to pressure SRC to pay her husband's medical bills. "The absence of the letter allowed the government to falsely assert that Loren-Maltese was not voicing the concerns of the townspeople

but rather her own selfish financial concerns." (Def.'s Reply at 12.)

The letter does conclude by saying, "If the service has not improved to a satisfactory level by January 1, 1995, the Town will be forced to look elsewhere for a claims adjusting firm." Defendant regards this as evidence of her resolve to ensure that the medical claims of Town employees would be properly handled. It may be true that Mr. Gillespie's argument to the jury would have had somewhat more force if the jury had known the date of the letter, and that he was remiss in not having offered the letter into evidence for the jury to examine. But, as <u>Strickland</u> pointed out, in assessing the prejudice resulting from counsel's errors,

> a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.

466 U.S. at 695-96. We believe that the failure to offer the September 8, 1994 letter into evidence was not an error that affected the outcome of the trial. For one thing, the letter contained a statement that was damaging to the defendant's theory that she was unacquainted with the widespread dissatisfaction among Town employees about the handling of their health insurance claims. The second paragraph of the letter reads as follows:

When Specialty Claims was originally selected to perform the function of claims adjustment on behalf of the Town, it was represented that all claims would be processed and paid within a sixty (60) day period. You have consistently failed to stay within those parameters and I am receiving continuous complaints from employees regarding non-payment, slow payment or other problems related to their medical claims.

We know from the testimony of Cynthia Camp that SRC's performance did not improve after September 8, 1994. Rather, it grew steadily worse. But instead of "looking elsewhere" for a claims adjusting firm, as threatened in the letter, the Town was still using SRC in April 1995, when Carol Guido's chemotherapy bills were still unpaid. On the whole, we think the letter of September 8, 1994, whether the jury knew its date or not, and whether considered alone or with all the other evidence, had no likelihood of persuading the jury that the defendant was either unaware of the backlog problem or, being aware of it, was attempting to do something about it. The second paragraph of the letter alone destroyed any contention that the defendant was unaware that SRC was consistently failing to pay claims.

The defendant also argues that her trial counsel was deficient in failing to call Mr. Both as a witness. According to Mr. Both's affidavit, "[d]uring the two years which followed the letter to Taylor, Betty asked representatives of the Town to explore other options regarding the Town's health insurance program. ... I was not directly involved in making these inquiries but recall hearing discussions and seeing memorandums describing other options and

their associated costs." (Both Aff. at ¶4 (emphasis added).) We do not see that this information would have had any prospect of persuading the jury that the defendant was actively attempting to correct the non-payment problem. How could it possibly take two years to explore other options regarding the Town's health insurance program? Clearly, SRC was in violation of the commitment it had made to process claims within sixty days, as asserted by defendant in the second paragraph of her September 8 letter. Mr. Both's affidavit says that he was unaware of the details of what was being done to explore other options, and we are unable to tell what, if any, personal knowledge he had as to facts that could have affected the outcome of the case.

A further problem with defendant's argument is that, as in the case of Carol Guido, defendant offers no evidence that Mr. Gillespie or Mr. Martin were ever made aware that Mr. Both had any helpful testimony to offer. There is no affidavit from the defendant, for instance, that she told her attorneys that Mr. Both had knowledge of facts that would be helpful to her defense. Nor is there any contention that Mr. Both himself made known to Messrs. Gillespie or Martin any matters about which he could offer favorable testimony. Mr. Both was interviewed by Messrs. Gillespie and Martin about the October 1996 Board meeting, and he could offer no help on that. We are reluctant to say that defense counsel had a duty to interview Mr. Both more generally, when even now, five

years after the trial, the defendant cannot suggest what favorable testimony Mr. Both could have given.  There were probably hundreds of Town employees who conceivably had information helpful to the defense, but that mere possibility does not impose upon counsel a duty to interview every employee.  There must be something to alert counsel to the need for an interview, and here, as far as we can see, there was nothing.

We conclude that not calling Dennis Both as a defense witness was not ineffective representation by defense counsel, and further, that the defendant suffered no prejudice as a result of his not being called.

## WHETHER AN EVIDENTIARY HEARING IS NECESSARY

Defendant moved for a evidentiary hearing on her petition, but we see no need for a hearing.  We called a status conference to inquire of counsel what the purpose of a hearing would be, and he explained that a hearing would be necessary only if we doubted the credibility of any of the witnesses who supplied affidavits in support of the petition.  As should be clear from what we have said thus far, our decision does not depend upon the credibility of defendant's affiants.  Accordingly, the motion for an evidentiary hearing is denied.

## CONCLUSION

The petitioner has failed to show a reasonable probability that, but for unprofessional errors by her trial counsel, whether

considered singly or in combination, the result of her trial would have been any different.  There is no reasonable probability that, absent what she alleges were errors, the jury would have had a reasonable doubt of her guilt on any count of the indictment.  This is clear even without applying Strickland's "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Applying the presumption, the conclusion becomes even stronger.

Neither is there any probability that, but for what the defendant alleges were unprofessional errors of counsel, the defendant's sentence would have been lighter in any respect than the sentence imposed.

For these reasons, the petition of the defendant Betty Loren-Maltese to vacate her conviction and sentence pursuant to 18 U.S.C. § 2255 is denied.


DATE:      November 8, 2007

ENTER:     _____
           John F. Grady, United States District Judge